## WALTER F. LAMAR v. THE STATE.

CRIMINAL PRACTICE.   *Intimidation of juror by district attorney and court.   Effect on just verdict.*

L. was on trial for an assault with intent to murder.   The jury had been sworn and witnesses were being examined.   The district attorney then, for the first time, was informed that A., one of the jurors, had been subpoenaed as a witness for the defendant, and that he had said before going on the jury that if he got on that jury he would hold it till hell froze over, or acquit defendant. He communicated this information to the court, and thereupon the judge announced his willingness to discharge the jury and order another trial, but the district attorney waived objection to the juror and the trial proceeded.

On a subsequent day of the trial the juror, A., at the instance of the district attorney, was sworn as a witness. Counsel for the defendant objected to the examination of him, and by order of the court the jury withdrew from the court-room. Then the examination of the witness proceeded. After several ineffectual questions as to witness having visited the accused and conspired to acquit him, the district attorney asked A. if he had ever made any such statement as set out above. This he denied. The jury were then brought in and told by the court that they had no concern in what had taken place. The trial proceeded and the defendant was convicted. *Held*, that although the verdict was demanded by the evidence and the law, appellant's conviction, by reason of the action of the court and district attorney in reference to the juror A., was not reached by a fair and impartial trial according to the requirements of law, and he is entitled to a new trial.

APPEAL from the Circuit Court of Yazoo County.

HON. T. J. WHARTON, Judge.

Walter F. Lamar was indicted upon a charge of assault with intent to kill and murder Arthur C. Crane. He was convicted, and appealed to this court. The question presented for adjudication here will be found stated in the opinion of the court.

*W. H. Luse*, for the appellant.

The natural result of the proceedings in reference to Adams was to make the balance of the jury suspicious of him and destroy his influence. The more scrupulous and honorable he might be the more he would be hampered and deterred in their deliberations on the verdict with the impression that he was suspected by the balance of the jury and by the court. The defense could not know what the court was going to decide as to motion to discharge Adams from the jury, and could not respond to the charge against the juror without exhibiting an anxiety for him that might prejudice their client. The court might have directed precautions *suo sponte*, or the State's attorney could have suggested same to avoid irregularities, or, when State's attorney withdrew his motion to discharge Adams, the case could have commenced *de novo*. We would here call the court's attention to the fact that the record shows that Adams was charged with having declared his purpose, if taken on the jury, to clear the prisoner, so there was implied in all the proceedings a distinct charge of perjury—a position, we claim, not calculated to make a man of honor and sensibility feel

" fair and impartial." The action of the court left the appellant without a fair and impartial jury. See *Martin* v. *State,* 63 Miss. 507, and authorities there cited.

*J. E. Everett,* on the same side.

The examination of the juror Adams and witnesses as to his qualifications after the jury had been impaneled and witnesses had been examined before the jury was a fatal error in the court. Jurors must be left free to act in accordance with the dictates of their judgments. The final decision rests with them, and interference such as the record in this case shows had the effect to trammel their minds and force them into a verdict against their honest convictions. If the proceedings by the court were in the least tainted with the odor of being inquisitorial, then they are violative of the constitutional protection guaranteed to every citizen charged with crime to a fair and impartial trial. The juror Adams must have felt very keenly the challenge made upon his integrity by the court. It certainly did not leave his mind as free to act as it was before the examination.

*T. M. Miller,* Attorney General, for the State.

It was objected that the juror Adams was allowed to be examined by the district attorney, in the absence of the rest of the jury, upon the question whether Lamar had endeavored to get him to be on the jury, etc. There is nothing in the objection, however, because the answers of the juror showed that he only visited Lamar in jail to inform him that he knew nothing about the case, so that he would not compel him to remain away from his business.

If the answers were true, it cannot be said that the juror was intimidated to the prejudice of the defendant. If false, it cannot be objected that he was thus given to understand that he was under suspicion. If he was thereby recalled to a sense of duty and the obligations of his oath, which in the end he acted under, the proceeding was altogether right and proper. But it will not do to assume that the reason and the conscience of a man selected to be a juror could be turned aside because of such a proceeding as this. He was given the opportunity to clear away a suspicion

concerning himself only, and did so to the satisfaction of the court and district attorney.

Shall it be said a new trial ought to be granted because, under fear of discovery, a juror had abandoned a corrupt design and decided a case according to law and the evidence? The law would be in contempt to hold such a doctrine.

CAMPBELL, J., delivered the opinion of the court.

The verdict rendered was demanded by the evidence and the law, and if there was no other question on the record the conviction would be affirmed without hesitation, but although we approve the verdict as the proper result of the testimony and law, if the accused did not have such a trial as he was entitled to he should yet have it; for no one should suffer the penalty of the law until he has been condemned according to its requirements.

After the jury had been sworn and witnesses had been examined the district attorney announced to the court (the jury not present) that he had learned since the acceptance of the jury that one of their number, Mr. Adams, had, before he went into the jury box, declared that if he got on the jury he would hold the jury until hell froze over or acquit prisoner, and it also appeared from a sub-pœna that Adams had been summoned as a witness for the defendant, of which the district attorney had been ignorant when the jury was impaneled. Thus moved by the district attorney, the court investigated the matter and announced a willingness to discharge the juror and begin the trial anew with another jury, and the district attorney withdrew his objection to the juror and asked to proceed with the trial as if no interruption had occurred, and it was done; the jury was brought in and the trial proceeded.

After much testimony had been given, and on a subsequent day of the trial, the district attorney called the juror Adams to the witness stand, and after he was sworn as a witness, asked him if he did not go to the jail in company with one Fryley, and if the prisoner did not ask them to conspire to acquit him by Adams' going on the jury and Fryley appearing as a witness; and after failing to elicit anything improper in the conduct of Adams at the

jail, the district attorney asked him about being summoned as a witness and then asked him if he had ever said to anybody that he intended to get on this jury and hold it until hell froze over, to which he replied in the negative. When the juror Adams was sworn as a witness and counsel for the prisoner objected to the examination, the court ordered the other jurors to retire from the court-room, which they did; and when the examination of Adams was concluded the other jurors were brought back and told by the court that what had transpired while they were absent was not a matter of any concern to them, and that they should not know anything of it. The trial was then proceeded with and concluded without further interruption.

Whether the court could lawfully have withdrawn the juror Adams and caused a mistrial, after witnesses had been examined is not the question before us. While the court was willing to do it, the district attorney shrank from it, and asked to be permitted to proceed with the trial. If this matter had ended there no harm would have been done, and no complaint could have been made of what occurred between court and counsel in the absence of the jury. But what is to be said of the subsequent proceeding by which the juror Adams was called from the box and interrogated first in the presence of his fellows, and afterward in their absence, as to his having visited the prisoner in jail, and what occurred there, and whether or not he had declared his purpose to be of the jury in order to acquit the accused? The object of this examination was not to determine as to a mistrial by withdrawing Adams from the jury. The thought of that had been abandoned, as we assume, and the only explanation suggesting itself to account for this interrogation of the juror Adams as a witness is that the district attorney, shrinking from the consequences of a mistrial, against the consent of the accused, and fearing lest the juror Adams was on the jury predetermined to acquit, resolved on the course pursued, to acquaint Adams and his fellows with the fact that he was under suspicion, and that information had been received which directed the investigation made. The influence of this proceeding on the jury may be supposed to have been unfavor-

able to the free and unconstrained action of its members. The suspect, " Adams," was thereby placed under bonds, as it were, to go against the prisoner in order to free himself from the charge made against him, and the other jurors were made to feel, as we may suppose, that they were in some manner implicated as members of a panel which was under suspicion by the officers and the public.

The legal theory of a trial by jury is the selection of an impartial body from the county, and its trial of the case free from any influence except that produced by the testimony and law and legitimate argument, and any subjection of the jury to any other influence is carefully guarded against. Twelve men must concur in preferring a charge of felony before one can be held to answer, and twelve men elected, impaneled, and sworn to try the issue joined must concur in a verdict of guilty before the humblest can, by our law, be deprived of his liberty, and such is the jealousy with which trial by jury is guarded that when it is made to appear that anything has occurred which may have improperly influenced the action of the jury, the accused will be granted a new trial, although he may appear to be ever so guilty, because it may be said that his guilt has not been ascertained in the manner prescribed by law, and every one is to be judged by the law. The suggestion is made that the effect of the proceeding was merely to impress on the jury a sense of duty, and, as it led to a correct result, no harm was done.

To inform a jury that an armed mob was about determined to take the life of the prisoner, or of any juror who stood in the way of his conviction, might have a persuasive influence in producing a proper verdict, but all would unite in condemning it as a travesty on judicial proceedings.

*Reversed and new trial granted.*